**Opinion issued December 19, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00323-CV

———————————

**RICK KLINE, D.D.S. AND KLINE DENTAL
IMPLANT, PLLC D/B/A SMILE TEXAS, Appellants**

**V.**

**ANTHONY LEONARD, Appellee**

---

**On Appeal from the 434th District Court
Fort Bend County, Texas
Trial Court Case No. 18-DCV-252609**

---

## MEMORANDUM OPINION

In this interlocutory appeal,[1] appellants, Rick Kline, D.D.S. ("Dr. Kline" or

"Kline") and Kline Dental Implant, PLLC, doing business as Smile Texas ("Kline

---

[1]     *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9).

Dental"), challenge the trial court's order denying their motion to dismiss the health care liability claim[2] brought against them by appellee, Anthony Leonard. In three issues, appellants contend that the trial court erred in denying their motion to dismiss Leonard's claim because he failed to serve them with an adequate expert report.[3]

We affirm.

## Background

In October 2011, Leonard underwent dental treatment by Dr. Kline at Kline Dental, doing business as Smile Texas. Leonard sought restorative dental work and expressed his desire to keep as many of his existing teeth as possible. Dr. Kline, a "cosmetic dentist," recommended a treatment plan called "Teeth in a Day," which involved extracting all of Leonard's teeth and replacing them with implants and prostheses, at a cost of $50,000.

On June 14, 2012, Dr. Kline extracted all of Leonard's teeth and installed implants and prostheses. Thereafter, Leonard's teeth were non-functional, his prostheses repeatedly detached or broke, and he experienced intense pain. Over the course of the next five years, Leonard returned to Kline for treatment more than 65

---

[2]  *See id.* § 74.001(a)(13) ("Health care liability claim" means a "cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract. . . .").

[3]  *See id.* § 74.351(a), (b).

2

times, without success. In October 2017, Kline refused Leonard any further treatment.

In January 2018, Leonard sought treatment from another restorative dentist, John T. Burdine D.D.S., M.Sc.D. Dr. Burdine determined that the dental work performed by Dr. Kline was non-functional, substandard, and incomplete. Burdine referred Leonard to a prosthodontist, Dr. Robert Velasco, who found that Leonard's prostheses were unstable, ill-fitting, "totally non-functional," and had caused Leonard pain and difficulty speaking. Velasco recommended re-construction of Leonard's prostheses.

On June 28, 2018, Leonard brought a negligence claim against Dr. Kline, alleging that he owed a duty to exercise the degree of care, skill, and diligence ordinarily possessed and employed by other members of the dental profession in good standing under the same or similar circumstances. Leonard asserted that Kline breached the standard of care by failing to advise him of "all treatment options, including those preserving his existing teeth"; failing to diagnose his periodontal disease; failing to use ordinary care in his treatment; failing to complete his dental restorations in a timely manner; and abandoning him prior to completion of the work. Leonard further alleged that Kline was acting within the course and scope of his employment with Kline Dental and that Kline Dental was vicariously liable for Kline's actions under the doctrine of respondeat superior.

Leonard asserted that appellants' breaches of the standard of care proximately caused him physical injury, unnecessary extraction of healthy teeth, pain, anxiety, and illness. And, as a direct and proximate result, he suffered pain, mental anguish, and disfigurement, in addition to unnecessary expense.

On August 6, 2018, appellants answered Leonard's suit with a general denial.[4]

On September 6, 2018, Leonard served upon Dr. Kline and Kline Dental an expert report authored by Dr. Burdine, along with his curriculum vitae ("CV"). Burdine, in his report and CV, states that he is a graduate of the University of Texas Health Science Center, Dental Branch, ("UTHSC") and has an advanced degree in periodontology from Boston University-Harvard Medical School. He is currently in private practice in Houston, specializing in the areas of periodontics,[5] oral medicine, and implantology. He has practiced in periodontics and oral medicine since 1975 and implantology since 1987. He is a Clinical Associate Professor at UTHSC, a Diplomate of the American Board of Periodontology, and a published author.

---

[4] "In a health care liability claim, a claimant shall, not later than the 120th day after *the date each defendant's original answer* is filed, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. . . ." TEX. CIV. PRAC. & REM. CODE § 74.351(a) (emphasis added).

[5] "A periodontist is a dentist who specializes in the prevention, diagnosis, and treatment of periodontal disease and in the placement of dental implants. Periodontists receive extensive training in these areas, including three additional years of education beyond dental school." AM. ACADEMY OF PERIODONTOLOGY, https://www.perio.org/consumer/what-is-a-periodontist (last visited December 16, 2019).

In his expert report, Dr. Burdine states that he is "familiar with the dental standard of care for dental diagnosis, treatment, and care of patients undergoing full mouth restoration by virtue of [his] medical education, [his] years of dental experience, and specific practice in the field of periodontics." Burdine has personally diagnosed, treated, and cared for many patients with the symptomology Leonard exhibited. Burdine opines that the applicable standard of care "requires that a complete oral, periodontal, occlusal and restorative exam, with both functional and esthetic considerations be made prior to any comprehensive treatment, and that all treatment options be presented to the patient." The standard of care also requires that mounted models of the patient's dentition be created in order to analyze and determine the options for restoration of the natural dentition. Further, the standard of care "requires that all oral diseases be identified and treated prior to comprehensive restorative therapy or oral surgery" and "that a surgeon operate in as clean an environment as possible."

Dr. Burdine states that he reviewed the records of Dr. Kline's treatment of Leonard from October 2011 through October 2017 and the dental records of Dr. Velasco's treatment of Leonard from February 2018 through June 2018. Burdine also personally examined and evaluated Leonard's condition.

Based on his review of Dr. Kline's medical records, Dr. Burdine noted that, when Kline first examined Leonard on October 18, 2011, Leonard reported having

5

no loose teeth and no jaw or tooth pain. Leonard complained that his missing teeth simply prevented his full smile, and he stated that he wanted to keep as many of his teeth as possible. The dental x-ray showed that Leonard had 17 teeth remaining, including an impacted third molar. Kline recommended only that he extract all of Leonard's remaining teeth and construct upper and lower prostheses. On June 14, 2012, Kline removed all of Leonard's teeth and placed 11 implants, and "upper and lower prosthetic teeth replacements were delivered." Thereafter, Leonard's course of treatment, some 65 appointments, continued until October 2017, without success. The records reflect that, throughout that period, Leonard experienced infection, prostheses failure, dysfunction, and pain.

On January 4, 2018, Leonard presented to Dr. Burdine's office complaining of pain, inability to chew, difficulty speaking, and social embarrassment. Leonard was without teeth, aside from a still-impacted third molar. In his examination of Leonard, Burdine noted that "[i]ll-fitting dentures were cemented" to implant abutments and that there was inflammation present around the prostheses. Leonard reported to Burdine, and Kline's records reflected, that the prostheses had a history of detaching and breaking. Burdine referred Leonard to Dr. Velasco, a prosthodontist, for treatment.

Dr. Burdine notes that Dr. Velasco's records reflect his findings that:

The prosthes[e]s [were] ill-fitting, with a very poor occlusal scheme, causing [Leonard] pain and difficulty speaking. Further, Dr. Kline did

6

not deliver what was discussed and promised on the original treatment plan, as the final prosthesis is cement retained Porcelain Fused to Metal (PFM), as opposed to Multilayered full-contour zirconia.

Both upper and lower prosthes[e]s were totally non-functional, with poor fit of each abutment, unstable and hygienically being very difficult to clean, due to both poor fit and design. Because the prosthes[e]s were so ill-fitting, the patient has to re-cement [them] on his own (at home dentistry), and this excess cement caused gingival inflammation around the implants and bone loss around the implants.

. . . . There is a finite life expectancy for the lower implants, as a direct result of the bone loss that has occurred since they were done in 2012.

Velasco recommended a treatment plan involving reconstruction of the prostheses, which Leonard was undergoing at the time of the report.

Dr. Burdine opines that, based on a reasonable degree of medical probability, Dr. Kline breached the applicable standard of care by failing to provide Leonard with appropriate and functional dental treatment. Burdine states that the record of Kline's exam, although cursory and limited, indicates "adequate bone on the FMX," "minimal pocket probing on the probe chart," and that the teeth were "stable." Thus, he opines, Leonard's teeth were "clearly salvageable." However, notwithstanding that his teeth were salvageable and that Leonard stated to Kline that he "wanted to keep as many remaining teeth as possible," "the only recommendation made by Dr. Kline was to extract all of [Leonard's] erupted teeth and the construction of upper and lower prosthetic replacements, at a cost of around $50,000." And, the medical records reflect that Kline discussed treatment fees with Leonard even before taking diagnostic records and formulating treatment options. Burdine explained that such

7

action suggests that Kline utilizes a pre-determined treatment plan, which is "entirely outside of the standard of care." And, "there is no indication that models were mounted," i.e., that models of Leonard's teeth were created to evaluate the way in which they fit together naturally. Burdine opines that Kline breached the standard of care by not discussing all treatment options with Leonard, such as periodontal therapy, routine restorative work, partial denture prostheses, implants, and bridges.

Dr. Burdine further notes that Dr. Kline stated on the anesthesia record that Leonard had periodontal disease. Thus, opines Burdine, Kline also breached the standard of care by making "no effort" to refer Leonard for a periodontal evaluation or to treat the disease before "embarking on this extreme treatment plan." And, Kline further breached the standard of care by providing Leonard with ill-fitting, non-functional implants and prostheses, that, despite at least 65 follow-up visits over the course of five years, were "never properly completed."

Dr. Burdine opines that Dr. Kline's breaches of the standard of care resulted in an excessively long course of treatment, during which Leonard experienced pain, difficulty chewing and speaking, and unnecessary expense. In addition, Kline's failure to treat Leonard's oral disease before beginning the restorations proximately caused his bone loss, implant failure, progression of infection, and additional pain.

Appellants moved to dismiss Leonard's negligence claim on the ground that Dr. Burdine's expert report is inadequate. Appellants asserted that Burdine is not

8

qualified to render an expert report in this case because he is a periodontist and Dr. Kline is a cosmetic dentist. Appellants asserted that Burdine's expert report and CV fail to establish that he possesses the knowledge, skill, experience, training, or education to evaluate Leonard's treatment. Although Burdine asserts that he is familiar with the management of restorative work in patients like Leonard and states that he has "treated many patients presenting with the same symptomology reflected in [Leonard's] history," "[n]one of these statements support his inference that he would know what a dentist in the same or similar circumstances as Dr. Kline does do, should do, or can do." Further, Burdine fails to state that he is trained in implantology, teeth building, placement, or adjustment, or that he has ever placed implant prostheses. Rather, Burdine is "only trained in the surgical aspect."

Appellants further complained that Dr. Burdine, in his report, fails to identify the applicable standard of care and offers only contradictory and conclusory statements, discussed below, with respect to his alleged breaches of the standard. And, "[t]here is a huge 'gap' between the alleged breach of the standard of care and the alleged damages." They argued: "Even if we make the impermissible assumption Dr. Burdine makes that Dr. Kline did not inform Mr. Leonard of all of his options, how did this directly or indirectly cause bone loss? How did the prostheses allegedly become non-functional?" Further, they assert, Burdine failed to acknowledge Leonard's "neurological condition that was the actual cause of his

9

broken prostheses: bruxism."[6]   Appellants asserted that Burdine simply did not explain how Kline's failure to follow the standard of care led to Leonard's failed outcome.  The trial court denied appellants' motion to dismiss Leonard's claim.

## Expert Report

In their first through third issues, appellants argue that the trial court erred in denying their motion to dismiss Leonard's negligence claim against them because his expert report is inadequate.  Specifically, appellants assert that Dr. Burdine is not qualified to opine as to the applicable standard of care and breach, and Burdine does not adequately address the elements of the standard of care, breach, and causation.

### A.    *Standard of Review and Legal Principles*

We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion.  *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.).  We apply the same standard to a trial court's determination that an expert is qualified.  *See Broders v. Heise*, 924 S.W.2d 148, 151–52 (Tex. 1996); *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 811 (Tex. App.—Houston [14th Dist.] 2008, no pet.).  When reviewing matters committed to a trial court's discretion, we may not

---

[6]      "Bruxism" is defined as the "habit of unconsciously gritting or grinding the teeth." *Bruxism*, MERRIAM–WEBSTER'S DICTIONARY (11th ed. 2003).

substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris Cty. Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.). However, a trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

A health-care-liability claimant must timely provide each defendant health care provider[7] with an expert report. TEX. CIV. PRAC. & REM. CODE § 74.351. An expert report means a "written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). In setting out the expert's opinions, the report must: (1) inform the defendant of the specific conduct the

---

[7] A "health care provider" means "any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care, including: . . . a dentist." TEX. CIV. PRAC. & REM. CODE § 74.001(12)(A)(ii).

11

plaintiff has called into question and (2) provide a basis for the trial court to conclude that the claims have merit. *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011). A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these purposes. *See id*. Rather, the expert must explain the basis of her statements and must link his conclusions to the facts. *Wright*, 79 S.W.3d at 52.

If a defendant files a motion to dismiss, challenging the adequacy of a claimant's expert report, a trial court must grant the motion if it appears, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report or that it is not sufficiently specific to provide a basis for the trial court to conclude that the claims have merit. TEX. CIV. PRAC. & REM. CODE § 74.351(*l*). The trial court, in assessing the sufficiency of the report, may not draw inferences, but instead must rely exclusively on the information contained within the four corners of the expert report or its accompanying curriculum vitae. *See In re McAllen Med. Ctr., Inc*., 275 S.W.3d 458, 463 & n.14 (Tex. 2008).

**B.** *Analysis*

1. *Qualifications*

In their first issue, appellants argue that Dr. Burdine, a periodontist, does not establish in his expert report that he is qualified to opine as to the applicable standard

of care or as to any breach thereof by Dr. Kline, a "cosmetic dentist." Specifically, appellants assert, Burdine does not establish that he has received training in placing dental implant prostheses or that he has ever performed any such procedure.

Whether an expert witness is qualified lies within the sound discretion of a trial court. *Broders*, 924 S.W.2d at 151. Not every licensed health care provider is qualified to testify on every medical question. *Id*. at 152–53. However, one need not be a practitioner in the same specialty as the defendant to be a qualified expert in a particular case. *Id*. at 153. Under the Rules of Evidence, the test is whether the offering party has established that the expert has the knowledge, skill, experience, training, or education to assist the trier of fact in understanding the evidence or determining a fact issue. *See* TEX. R. EVID. 702; *Broders*, 924 S.W.2d at 153; *see also Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003); *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ("[T]rial courts may qualify a medical witness of a different specialty to testify if the witness has practical knowledge of what is usually and customarily done by other practitioners under circumstances similar to those confronting the malpractice defendant.").

In a suit involving a health-care-liability claim against a health care provider, as here, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

> (1)    is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant

health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2)    has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3)    is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM. CODE § 74.402(b).  In determining whether a witness is qualified on the basis of training or experience, the court "shall consider" whether, at the time the claim arose or at the time the testimony is given, the witness:

(1)    is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2)    is actively practicing health care in rendering health care services relevant to the claim.

*Id.* § 74.402(c).  Thus, qualification under section 74.402 does not turn on specific credentialing; rather, it turns on the expert's competence with the type of care delivered to the patient and the expert's knowledge of the standard governing diagnosis and treatment of the patient's condition.  *See id.*; *Broders*, 924 S.W.2d at 153; *Keo*, 76 S.W.3d at 732.

The substance of Leonard's claim is that Dr. Kline improperly performed full-mouth extraction of his teeth and replacement with implants and prostheses.  Dr. Burdine, in his expert report, states that, "by virtue of [his] medical education, [his] years of dental experience, and specific practice in the field of periodontics," he is

14

familiar with the standard of care for the diagnosis, treatment, and care of patients undergoing full-mouth restoration. Burdine's CV reflects that he is a licensed dentist with an advanced degree in periodontics. Burdine specifically states that he has been practicing in implantology since 1987. He is currently in private practice, including implantology, and treats patients four days per week. And, he has "personally diagnosed, treated, and cared for many patients, such as [Leonard]."

Thus, Dr. Burdine's expert report establishes that, at the time of the report or at the time that Leonard's claim arose, Burdine was "practicing in a field of practice that involves the same type of care or treatment as that delivered by" Dr. Kline. *See* TEX. CIV. PRAC. & REM. CODE § 74.402(b). In addition, the report establishes that Burdine "has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim." *See id.* Further, Burdine's expert report establishes that he is qualified on the basis of training or experience to offer an expert opinion regarding the accepted standards of health care because it demonstrates that he is a licensed dentist, has an advanced degree in periodontics, and is actively rendering healthcare services relevant to the claim, i.e., implantology. *See id.* § 74.402(b), (c).

Appellants argue that Dr. Burdine's expert report is deficient because it does not expressly state that his education, which he completed in 1974, included implantology. We note that a "periodontist" is generally defined as a "dentist who

15

specializes in the prevention, diagnosis, and treatment of periodontal disease *and in the placement of dental implants*." AM. ACADEMY OF PERIODONTOLOGY, https://www.perio.org/consumer/what-is-a-periodontist (last visited December 16, 2019) (emphasis added). And, again, Burdine expressly states in his report that he has been practicing implantology since 1987. Appellants provide no authority to support their assertion that an expert report need itemize specific coursework.

We conclude that the trial court could have reasonably concluded that Dr. Burdine's expert report demonstrates that he is qualified to render an opinion as to the standard of care applicable to a dentist treating a patient with the conditions with which Leonard presented and as to breaches of the standard. *See* TEX. CIV. PRAC. & REM. CODE § 74.402; *see also* TEX. R. EVID. 702. Accordingly, we hold that the trial court did not abuse its discretion in denying appellants' motion to dismiss Leonard's claim on the ground that Burdine is not qualified to render an expert report.

We overrule appellants' first issue.

2. *Standard of Care and Breach*

In their second issue, appellants argue that Dr. Burdine's report is substantively inadequate as to the applicable standard of care and breach because Burdine's report is "internally inconsistent" and "conclusory."

Identifying the standard of care in a health care liability claim is critical: "Whether a defendant breached his or her duty to a patient cannot be determined

16

absent specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880. Again, an expert report must provide a "fair summary" of the expert's opinion regarding the applicable standard of care and the manner in which the care rendered by the health care provider failed to meet the standard. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6). "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached," it "must set out what care was expected, but not given." *Palacios*, 46 S.W.3d at 880.

In his report, Dr. Burdine explains that "the standard of care requires that a complete oral, periodontal, occlusal and restorative exam, with both functional and esthetic considerations being made prior to any comprehensive treatment and all treatment options be presented to the patient." And, such discussion "must include considerations as to the patient's goals." The standard of care also requires that mounted models of the patient's dentition be created in order to analyze and determine the options for restoration of the natural dentition. The standard of care further requires that a surgeon operate in a clean environment and thus that all oral disease be identified and treated prior to comprehensive restorative therapy or oral surgery. And, the standard of care requires that restorations be properly fitted and functional. Thus, Dr. Burdine clearly identifies the pertinent standard of care for comprehensive, restorative dental treatment. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *Palacios*, 46 S.W.3d at 880.

17

With respect to breach, Dr. Burdine opines in his report that, notwithstanding that Dr. Kline's medical records establish that Leonard's teeth were "certainly salvageable" and that Leonard stated to Dr. Kline that he "wanted to keep as many remaining teeth as possible," "the only recommendation made by Dr. Kline was to extract all of [Leonard's] erupted teeth and the construction of upper and lower prosthetic replacements, at a cost of around $50,000." Burdine opines that Kline breached the standard of care by not discussing all treatment options with Leonard, such as periodontal therapy, routine restorative work, partial denture prostheses, implants, and bridges. And, Burdine notes that "there is no indication that models were mounted," i.e., that models of Leonard's teeth were created to evaluate the way in which they fit together naturally.

Dr. Burdine also opines that Dr. Kline, after noting on his anesthesia record that Leonard had periodontal disease, breached the standard of care by making "no effort" to refer Leonard for a periodontal evaluation or to treat his periodontal disease before "embarking on this extreme treatment plan." And, Kline breached the standard of care by providing Leonard with ill-fitting, non-functional implants and prostheses, that, despite at least 65 follow-up visits over the course of five years, were "never properly completed."

Appellants assert that Dr. Burdine's expert report is inadequate because it contains contradictory statements. For instance, Burdine's statement that "it was

18

discussed with Mr. Leonard the options of saving versus extracting his teeth, his periodontal status, and bruxism" contradicts his assertion that Dr. Kline breached the standard of care by failing to discuss all treatment options. Thus, appellants assert, "the standard of care does not appear to have been breached."

In our analysis of the statutory adequacy of an expert report, we do not determine whether the expert's conclusions are correct, but only whether the analysis used to reach them is reliable. *See Keo*, 76 S.W.3d at 734; *see also Gannon v. Wyche*, 321 S.W.3d 881, 892 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("Even assuming conflicts exist between the facts on which [the expert] relies and the medical records, . . . [a]ccepting the premise that an expert's report may not contradict the medical records in such a case would preclude a plaintiff from ever being able to satisfy the expert-report requirement. Further, the credibility and weight to be given to the facts supporting the expert's opinion is an issue for trial."). Dr. Burdine opines, based on his review of the medical records, that the only treatment option that Dr. Kline presented to Leonard was the extraction of all of his teeth. This is sufficient to satisfy the statute. *See Scoresby*, 346 S.W.3d a 556.

Appellants further complain that the report requires impermissible inferences. For instance, Dr. Burdine infers that Dr. Kline failed to mount models of Leonard's dentition based on there being no such models noted in his medical record. Section 74.351 does not prohibit experts, as opposed to courts, from making inferences based

upon silence in a patient's medical record. *See Clavijo v. Fomby*, No. 01-17-00120-CV, 2018 WL 2976116, at \*10 (Tex. App.—Houston [1st Dist.] June 14, 2018, pet. denied) (mem. op.) (holding that expert was not prohibited from inferring, based on lack of documented wound evaluation, that such did not occur); *Quinones v. Pin*, 298 S.W.3d 806, 813 (Tex. App.—Dallas 2009, no pet.) (holding that medical expert properly relied on silence in medical record to support inferences); *Granbury Minor Emergency Clinic v. Thiel*, 296 S.W.3d 261, 265 (Tex. App.—Fort Worth 2009, no pet.) (noting that section 74.351 does not prohibit experts, as opposed to courts, from making inferences based on patient's medical history); *see also Gannon*, 321 S.W.3d at 892 (noting that whether expert's factual inferences are accurate is question for fact finder and should not be considered when ruling on section 74.351 motion to dismiss).

We conclude that the trial court could have reasonably concluded that Dr. Burdine's report represents a "good faith effort" to inform Dr. Kline of the specific conduct called into question, the standard of care that should have been followed, and what he should have done differently. *See Palacios*, 46 S.W.3d at 880. Accordingly, we hold that the trial court did not abuse its discretion in denying appellants' motion to dismiss Leonard's health care liability claim on the ground that Burdine's expert report was inadequate as to the applicable standard of care and the manner in which it was breached.

We overrule appellants' second issue.

3.     *Causation*

In their third issue, appellants argue that Dr. Burdine's expert report is inadequate as to the element of causation because Dr. Burdine "fails to link the damages sustained by Leonard to any specific breach of an applicable standard of care." Appellants assert that "Burdine's report never makes clear what actions Dr. Kline took to cause the alleged damages" and "fail[s] to disprove the possible alternative that Leonard's bruxism was the cause of the failed treatment."

An expert report must provide a fair summary of the expert's opinions regarding the causal relationship between the failure of a health care provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6). A causal relationship is established by proof that the negligent act or omission constituted a substantial factor in bringing about the harm and that, absent the act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.). However, an expert report need not marshal all of the plaintiff's proof necessary to establish causation at trial, and it need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court. *Wright*, 79 S.W.3d at 52; *Cornejo v. Hilgers*, 446 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

The expert must simply provide some basis that a defendant's act or omission proximately caused injury. *Wright*, 79 S.W.3d at 53. And, the expert must explain the basis of his statements and link his conclusions to the facts. *Id*. at 52. "No particular words or formality are required [in the expert report], but bare conclusions will not suffice." *Scoresby*, 346 S.W.3d at 556.

Again, in assessing the sufficiency of a report, a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report. *In re McAllen Med. Ctr.*, 275 S.W.3d at 463 & n.14. However, section 74.351 does not prohibit experts, as opposed to courts, from making inferences based on medical history. *Clavijo*, 2018 WL 2976116, at *10.

In his expert report, Dr. Burdine opines that Dr. Kline's failure to discuss with Leonard all of his treatment options and to heed Leonard's desire to keep as many teeth as possible, caused Leonard to unnecessarily consent to the extraction of all of his teeth. Burdine opines that the record of Kline's exam, although cursory and limited, indicates "adequate bone on the FMX," "minimal pocket probing on the probe chart," and that the teeth were "stable." Thus, he opines, Leonard's teeth were "certainly salvageable."

Dr. Burdine further opines that a periodontist acting with ordinary care would have foreseen that Leonard, having not visited a dentist for five years prior to presenting for his initial treatment, would have a build-up of debris and

22

inflammation in his mouth. And, Dr. Kline noted on his anesthesia report that Leonard had periodontal disease. Burdine opines that Kline's failure to refer Leonard for a periodontal evaluation and failure to treat his disease before extracting all of his teeth caused the progression of his infection, implant failure, soft tissue loss, bone loss, and pain.

Burdine further opines that Dr. Kline's breaches of the standard of care with respect to providing Leonard's implants and prostheses caused his "excessively long course of treatment," failed outcome, pain, difficulty speaking and chewing, social embarrassment, and loss of an exorbitant amount of time and money on a failed restorative treatment and repair.

Appellants assert that the report is inadequate with respect to causation because Dr. Burdine does not address the alternative possibility that Leonard's failed restoration was caused by bruxism, i.e., grinding or clenching his teeth. Again, however, an expert report need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court. *See Wright*, 79 S.W.3d at 52; *Cornejo*, 446 S.W.3d at 123.

We conclude that the trial court could have reasonably concluded that Dr. Burdine's expert report represents an objective good faith effort to inform Dr. Kline of the causal relationship between his failure to provide care in accord with the pertinent standards of care and the injury, harm, or damages claimed. *See Palacios*,

46 S.W.3d at 879; *Kelly v. Rendon*, 255 S.W.3d 665, 679 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (emphasizing that expert reports "are simply a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support"). Accordingly, we hold that the trial court did not abuse its discretion in denying appellants' motion to dismiss Leonard's health care liability claim on the ground that the expert report is inadequate with respect to the element of causation.

We overrule appellants' third issue.

## Conclusion

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Landau and Hightower.